IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


LITTLE ROCK REED,
a/k/a Timothy Reed,

        Plaintiff,

   vs.                                        No. CIV 98-128 LFG/RLP

STATE OF NEW MEXICO, et. al,

        Defendants.


## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION FOR SUMMARY JUDGMENT

THIS MATTER came before the Court on Defendant Anthony Tupler's Motion for Summary Judgment [Doc. 71]. Defendant seeks summary dismissal of Plaintiff's claims brought under 42 U.S.C. §§ 1983, 1985 and 1986, together with dismissal of Plaintiff's claims brought under the New Mexico Tort Claims Act, NMSA 1978 § 41-4-1 *et. seq.*

### Nature of Lawsuit

This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and action for damages brought under the New Mexico Tort Claims Act. The claims arise following Plaintiff, Timothy "Little Rock" Reed's ("Reed") arrest and incarceration on a fugitive warrant following an earlier court proceeding that successfully challenged his arrest on the same warrant. Reed was arrested in Albuquerque, New Mexico on November 17, 1996, and held at the Bernalillo County Detention Center ("BCDC") until his release on December 16, 1996, a period of thirty days. This lawsuit challenges the validity of his arrest and the legality of his subsequent incarceration.

## Summary Judgment Standards

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S. Ct. 1598 (1970); *Quaker State Minit-Lube, Inc.,* v. *Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment must shoulder the initial burden of establishing the absence of a question of fact. *Adickes*, 398 U.S. at 144. That burden is carried when the moving party demonstrates that the undisputed facts entitle the moving party to judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986). That initial burden can be shouldered when the moving party demonstrates by way of admissible evidence, that is, by deposition, answers to interrogatories, admissions, affidavits or documentary evidence that the undisputed facts entitle the moving party to judgment. *Id.*.

A party opposing summary judgment must do more than rely on its pleadings or mere argument or contention of counsel to defeat a *prima facie* showing of entitlement to judgment. Federal law provides that the party opposing the motion for summary judgment must affirmatively come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Id.* at 324. "Hearsay testimony cannot be considered because `[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'" *Gross v. Burggraf Const. Co*., 53 F.3d 1531, 1540 (10th Cir. 1995)(quoting *Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995)). This requirement is made clear in the rule itself:

> An adverse party may not rest upon mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate will be entered against the adverse party.

Fed. R. Civ. P. 56. Thus, the burden on the party opposing a motion for summary judgment is significantly greater when the moving party successfully makes a *prima facie* showing of entitlement to judgement. The test is not whether the party opposing the motion will be able to demonstrate a factual dispute at trial, but, rather, whether, in response to the motion, that party can demonstrate the presence of a material, factual dispute. "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is `genuine', an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawnmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997). The Court will consider the motions in light of the above standards.

In support of his motion for summary judgment, Defendant Anthony Tupler ("Tupler") submitted a statement of undisputed facts. Each fact is supported by admissible evidence. Reed, for the most part, does not object to Tupler's factual recitation. All material facts to which Reed has not specifically controverted are, therefore, deemed admitted. D.N.M.LR-Civ. 56.1(b). Reed, did nonetheless, object to some facts and the Court will not consider those facts which are controverted and material.[1] Following are the undisputed facts considered by the Court in ruling on the motion.

---

[1] Reed objects to undisputed material facts Nos. 6, 18, 22, 31, 32, 43, 44, 45, 46, 52, 57, 59, 60, 61, 62, 63, 64, 65, 66, 67, 72, 74, 94, 95, 96, 104, 107, 119, 120 and 121. To the extent these facts or other facts relate to Defendants Udall and Schwartz, the Court finds them moot in light of their dismissal from the lawsuit. Thus, the Court will not consider Nos. 68, 69, 98, 99, 100, 101, 102, 103, 104, 105, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 119 and 120. With regard to Nos. 31, 32, 43, 44, 45, 46, 52, 57, 94, 95, 96 and 121, the Court finds that Reed offers legal argument in support of his objections and this is not admissible

1. Plaintiff was incarcerated in Texas from 1979 through January, 1982. (Dep. Reed at p. 18. Lines 5-6).

2. In 1982 and 1983, Reed pled guilty in Ohio to one charge of theft of drugs and two charges of aggravated robbery. *Reed v. State*, 124 N.M. 129, 947 P.2d 86, 89 (1997).

3. Reed was sentenced to concurrent terms of up to twenty-five years imprisonment. *Id.*

4. Reed was incarcerated in the Ohio Department of Corrections from May, 1982 until May, 1992. (Dep. Reed at p. 18, lines 11-13).

5. On May 5, 1992, Reed was released from prison on parole. (Dep. Reed, p. 21, lines 9-11).

6. Reed admits a State of Ohio waiver of extradition (parole) may contain an authentic signature by him. (Dep. Reed, p. 17, lines 8-12, Ex. D).

7. The waiver of extradition provides in pertinent part that "should I leave the state of Ohio without . . . written permission, I will be considered to be a fugitive of justice as that term is defined in the Uniform Extradition Act and should I be found in another state, I hereby waive extradition and do hereby waive all of my rights to demand the issuance and service of a warrant of extradition and to apply to writ of habeas corpus and waive the issuance and service of all extradition proceedings."

8. Reed signed the first page of the State of Ohio Department of Rehabilitation and Corrections Adult Parole Authority Conditions of Supervision. (Dep. Reed, p. 68, lines 16-25; p. 69, lines 1-3; Ex. E).

9. In March, 1993, Reed left Ohio. *Reed*, 947 P.2d at 93.

10. Reed eventually ended up in Taos, New Mexico. *Id.*

11. On October 26, 1994, Reed was arrested as a fugitive from justice. *Id.*

---

evidence. The Court will not consider Nos. 59-67.

12. Reed contested his extradition. *Id.* at 94-95.

13. On January 20, 1995, in the Eighth Judicial District Court, the Honorable Peggy Nelson, granted habeas corpus to Reed on the ground, inter alia, that he was not a fugitive from justice because he left Ohio "under duress and under a reasonable fear for his safety and his life." *Id.* at 95.

14. Following Judge Nelson's decision, Reed was released from custody. (Dep. Tupler at p. 78, lines 9-13).

15. The State appealed from the district court decision. *Id.*

16. Tupler handled the appeal on behalf of the State. (Dep. Tupler at p. 43, lines 9-10).

17. Assistant Public Defender Sue Hermann ("Hermann") handled the appeal on behalf Reed. (Dep. Reed at p. 28, lines 5-6 and 20-25).

18. On November 16, 1996, Reed was arrested in Albuquerque, New Mexico and taken to the Bernalillo County Detention Center. (Dep. Reed at p. 24, lines 10-13).

19. At the time of Reed's arrest, his case from Taos was still on appeal in the New Mexico Supreme Court. (Dep. Reed at p. 27, lines 18-21).

20. On November 17, 1996, Katherine Marquez ("Marquez") was the full-time Extradition Coordinator in the Second Judicial District Attorney's Office. (Dep. Marquez at p. 4, lines 7-10 and p. 14, lines 20-23).

21. Her duties included preparing the paperwork for fugitives arrested in New Mexico who are wanted by other states. (Dep. Marquez, p. 14, lines 24-24 and p. 15, lines 1-4).

22. Reed was a fugitive arrested in New Mexico and wanted by another state. (Dep. Marquez at p. 15, lines 5-10).

23. In a typical case of a fugitive arrested in New Mexico and wanted by another state,

Marquez first receives from the jail a booking slip stamped "out of state." She then checks the charges and also looks for local charges. Marquez then looks for a contact person in the demanding state. She either calls or teletypes the demanding state to confirm the charges and to inquire whether they wish to extradite the defendant. She confirms the charges either by having the demanding state fax a copy of the bench warrant or charging document or by calling the demanding state to ask what the charges are. The charges are confirmed so that she can proceed with a fugitive complaint. (Dep. Marquez at p. 15, lines 11-25; p. 16, line 1; p. 17, lines 21-25; p. 18, lines 1-14).

24. Marquez would type out a fugitive complaint. This complaint would include the criminal defendant's name, date of birth, social security number, the charges, that he was wanted by another state and the date he was arrested. (Dep. Marquez at p. 18, lines 16-20).

25. In the typical case, the fugitive complaint is then filed in the state district court with an "ER" number for extraditions. (Dep. Marquez at p. 18, lines 21-23).

26. Once the fugitive complaint is filed, the district court clerks automatically know they need to set it for arraignment on the complaint. (Dep. Marquez at p. 19 lines 3-6).

27. Marquez' understanding of what happens at the arraignment is that the fugitive is taken before the judge and advised that another state wants him back on the charges stated in the complaint. He is then asked whether he wishes to sign a waiver of extradition to return. The fugitive may or may not be represented by counsel. He may retain a private attorney. If he has no private attorney, the public defender has an on-duty attorney at the arraignments who may be appointed to represent the fugitive for purposes of the arraignment. If the fugitive signs a waiver of extradition to return to the demanding state, the judge then allows a certain period of time for pickup by the demanding state. If the fugitive does not sign a waiver of extradition, the demanding state typically has 90 days to

perfect an application for requisition which is submitted to the governor of the State of New Mexico for the purpose of asking the governor to issue a Governor's Warrant. Depending on the charges, the judge may or may not allow the fugitive to bond out pending receipt of the Governor's Warrant. (Dep. Marquez at p. 20, lines 11-25; p. 22, lines 1-11; p. 24, lines 3-7, 10-25; p. 25, lines 1-2).

28. If there is a pre-signed waiver of extradition by the fugitive, this document is included in the file for the judge. (Dep. Marquez at p. 38, lines 15-25; p. 39, lines 1-7).

29. Marquez is not aware of any written policies and procedures manual or rules and regulations regarding how extraditions are to be handled. (Dep. Marquez at p. 121, lines 17-20).

30. Marquez is guided in her decision-making process by the training she received. (Dep. Marquez at p. 121, lines 24-25; p. 122, lines 1-3).

31. Reed's case was completely different from a "normal extradition." (Dep. Marquez at p. 27, lines 15-17).

32. Hermann called and demanded that Reed be released immediately. She further advised that Reed was contesting his extradition, that the matter was pending in Santa Fe, that they were awaiting a decision, and that he could not be extradited to Ohio. Marquez further recalls that Hermann advised her that Assistant Attorney General Anthony Tupler was involved in the case and that she, Herman, was going to request an immediate court date in Santa Fe. (Dep. Marquez at p. 29, lines 10-13; p. 40, lines 6-10, 19-25; p. 41, lines 1, 11-18, 23-25; p. 42, lines 1-6, 16-21; p. 43, lines 6-8; p. 51, lines 6-9; p. 55, lines 22-25).

33. Marquez received a facsimile from Hermann consisting of a letter dated November 18, 1996 to her from Hermann, Release Order and Decision in *Timothy Little Rock Reed v. Manuel Ortiz, Director Taos County Detention Center*, No. 94-Cr., County of Taos. (Dep. Marquez at p. 43, lines

14-15; p. 45, lines 13-17; p. 46, lines 7-21).

34. Anthony "Tony" Tupler is an Assistant Attorney General ("AAG") with the New Mexico Office of the Attorney General. (Dep. Tupler at p. 4, lines 18-20).

35. AAG Tupler worked in the criminal appeals division of the Attorney General's Office briefly in 1976, and, then, continuously since July 1981. (Dep. Tupler, p. 18, lines 2-6).

36. In November-December 1996, he worked in the Criminal Appeals Division of the Attorney General's office and handled extraditions for the State of New Mexico. (Dep. Tupler at p. 19, lines 10-17).

37. A "requisition" is when New Mexico is requesting that another state return a fugitive to New Mexico. (Dep. Tupler at p. 19, lines 25; p. 20, lines 1-3).

38. A "rendition" is when another state is requesting a fugitive in custody in New Mexico. (Dep. Tupler at p. 19, lines 22-24).

39. The typical first step in a rendition is the filing of a fugitive-from-justice complaint. (Dep. Tupler at p. 21, lines 22-24).

40. The Criminal Appeals Division of the Office of the Attorney General does not file fugitive-from-justice complaints. (Dep. Tupler at p. 21, lines 10-22).

41. They are filed by the district attorneys' offices. (Dep. Tupler at p. 21, lines 10-25; p. 22, lines 1-8).

42. As an AAG working on renditions, AAG Tupler would typically call the district attorney's office to see whether the subject was in custody and whether he has waived yet. (Dep. Tupler at p. 20, lines 21-25; p. 21, lines 1-3; p. 22, lines 9-14).

43. The next step he typically takes is to review the requisition material from the demanding

state for legal sufficiency and appropriate legal form. (Dep. Tupler at p. 22, lines 15-17).

44. He then makes a determination whether it should be approved as to legal sufficiency and form. (Dep. Tupler at p. 22, line 25; p. 23, lines 1-16).

45. If he determines it should be approved, he signs off on a cover sheet, approving the packet as to legal form, and the packet is then delivered to the governor's office for issuance of the Governor's Warrant. (Dep. Tupler at p. 22, line 25; p. 23, lines 1-16).

46. There are no written policies and procedures in the Office of the Attorney General with respect to the rendition of a fugitive. (Dep. Tupler at p. 211, lines 19-22; p. 212, lines 1-6).

47. They advise the governor's office, the district attorneys and Department of Corrections in accordance with the statute and the applicable case law. *Id.*

48. AAG Tupler learned that Reed had been arrested in Bernalillo County on November 16, 1996, on the Monday following Reed's arrest. (Dep. Tupler at p. 100, lines 1-4).

49. Marquez called AAG Tupler and advised him that Reed had been arrested, that she had already spoken with Hermann, and that Hermann was insisting that Reed be immediately released from custody. (Dep. Tupler at p. 100 lines 9-16, 19-25; p. 101, lines 1-3; Dep. Marquez at p. 49, lines 22-25; p. 50-51, p. 52, lines 10-25, 35).

50. AAG Tupler believes he had more than one telephone conversation with Marquez on November 18, 1996. (Dep. Tupler at p. 103, lines 12-16).

51. AAG Tupler did not instruct Marquez to do anything. (Dep. Tupler at p. 103, lines 1-4).

52. Marquez calls him for advice. (Dep. Tupler at p. 103, lines 5-7).

53. AAG Tupler advised Marquez to proceed as usual with the understanding that Reed's case was on appeal, that they had lost in district court in Taos County; that Reed had been released

on a writ of habeas corpus; and that there was a fair question over what was happening in Bernalillo County. AAG Tupler advised her "that was Taos County. This is now Bernalillo County, so this is a new extradition." (Dep. Tupler at p. 104, lines 5-22; Dep. Marquez at p. 51, lines 10-18; p. 52, lines 22-25; p. 53, lines 20-25; p. 55, lines 19-25; p. 56, lines 1-6).

54. Following this conversation with AAG Tupler, Marquez understood that she was to proceed in a normal fashion. (Dep. Marquez at p. 57, lines 14-22).

55. However, she did not proceed in a normal fashion. (Dep. Marquez at p. 57, lines 23-24).

56. The reason she did not proceed in a normal fashion is because, soon after, she received another call from AAG Tupler. (Dep. Marquez at p. 57, lines 23-25).

57. AAG Tupler also received a call from Hermann (Dep. Tupler at p. 105, lines 8-14).

58. On November 19. 1996, Marquez faxed AAG Tupler a copy of the pre-signed waiver she received from Ohio with the following comments: "Regarding Reed, Timothy, Date of birth 10/30/60/Ohio. Following is a copy of the presigned waiver faxed to our agency by the state of Ohio. I've checked with the Bernalillo County Detention Center, and he does not have any locals pending against him. I'll keep you advised if and when I hear of a court date for subject. Thanks. Tony." Dep. Marquez at p. 36, lines 24-25; p. 37, lines 1-18.

59. She faxed the pre-signed waiver to AAG Tupler because he requested it. (Dep. Marquez at p. 37, lines 19-21).

60. On November 19, 1996, AAG Tupler received a facsimile with the pre-signed waiver from Marquez. (Dep. Tupler at p. 110, lines 12-15).

61. On December 11, 1996, the New Mexico Supreme Court heard oral argument on the petition filed by Hermann. (Dep. Tupler at p. 142, lines 13-22).

62. The New Mexico Supreme Court stayed any proceedings that would cause Reed to be surrendered to Ohio authorities and remanded any sort of bond or release to the District Court in Bernalillo County. (Dep. Tupler at p. 152, lines 23-25; p. 153, lines 5-12).

63. AAG Tupler received the order from the New Mexico Supreme Court in Reed's case within a day or two. (Dep. Tupler at p. 174, lines 18-21).

64. As of December 12, 1996, AAG Tupler considered his involvement finished in the November-December 1996 matter regarding Reed. (Dep. Tupler at p. 180, lines 16-20).

65. The remaining question was the matter of bail. *Id.*

66. AAG Tupler does not recall speaking with Assistant District Attorney Phillip Cheves prior to December 11, 1996. (Dep. Tupler at p. 154, lines 1-5).

67. AAG Tupler spoke with ADA Phillip Cheves within a week prior to the hearing before Judge Murdoch regarding the inapplicability of the principles of *res judicata* and collateral estoppel in extraditions. (Dep. Tupler at p. 148, lines 16-25; p. 149, lines 1-25; p. 150, lines 1-14; p. 126, lines 3-11, 13-16).

68. On December 16, 1996, Reed was released following a hearing before the Honorable Pat Murdoch. (Complaint ¶ 35).

69. On September 9. 1997, the New Mexico Supreme Court issued its opinion in *Reed v. State*, 124 N.M. 129, 947 P.2d 86 (1997).

70. On June 8, 1998, the United States Supreme Court issued a *per curia* decision reversing the New Mexico Supreme Court. *New Mexico ex. Rel. Ortiz v. Reed*, 118 S. Ct. 1860 (1998).

71. AAG Tupler is familiar with the extradition proceeding that took place in Taos County, New Mexico in October-December 1994 and January 1995. (Dep. Tupler at p. 27, lines 4-9).

72. AAG Tony Tupler reviewed the governor of Ohio's requisition papers and found them to be in proper legal form. (Dep. Tupler at p. 36, lines 9-18).

73. By "proper legal form", AAG Tupler means that the four factors of the United States Supreme Court decision in *Michigan v. Doran*, 439 U.S. 282, 289 (1978). (Dep. Tupler at p. 38, lines 5-9).

74. AAG Tupler's understanding of NMSA. 1978 § 31-4-4 is that the governor has discretionary power to request the Attorney General or any prosecuting officer to investigate whether the Governor's Warrant should issue. (Dep. Tupler at p. 26, lines 15-22, 23-25).

75. AAG Tupler advised John Paternoster, Reed's attorney at the time, that the governor had no authority to investigate. (Dep. Tupler at p. 28, lines 24-25; p. 29, lines 1-4).

76. The basis of his statement was that, in this particular case, Reed was clearly a fugitive, and it was the responsibility of the governor of New Mexico to cause the issuance of the Governor's Warrant under United States Supreme Court precedent. An investigation would reveal nothing that would militate against that responsibility under the statute and, therefore, it was not a discretionary call at that time for the governor of New Mexico to conduct an investigation to determine whether he should issue his warrant. (Dep. Tupler at p. 29, lines 5-17).

77. AAG Tupler believes that Reed's nativity is irrelevant to the underlying extradition. (Dep. Tupler at p. 62, lines 17-18).

78. AAG Tupler believes that Reed's motive for leaving Ohio was irrelevant to the underlying extradition. (Dep. Tupler at p. 63, lines 11-17).

79. AAG Tupler believes that the pre-signed waiver negated Reed's presumptive right to resist extradition. (Dep. Tupler at p. 91, lines 7-8).

80. AAG Tupler believes that there is no judicial requirement for a hearing prior to extradition of a criminal defendant on the basis of a pre-signed waiver and he so advised the district attorneys. (Dep. Tupler at p. 99, lines 15-17; p. 112, lines 1-11; p. 115, lines 15-18).

81. AAG Tupler advised the district attorneys that if they have a certified copy of or otherwise indisputably authentic copy of a pre-signed waiver, the law does not require them to conduct any kind of proceedings other than to ascertain, with some varying degree of certainty, that the person they have in custody is the same person who is subject to the waiver before the subject may be turned over to the demanding state. (Dept. Tupler at p. 112, lines 1-12; p. 115, lines 15-18).

82. It was AAG Tupler's opinion in November-December 1996 that Reed could be extradited to Ohio on the basis of the pre-signed waiver. (Dept. Tupler at p. 187, lines 5-17).

83. Sometime within the last year, AAG Tupler spoke with someone in the governor's office regarding whether the governor's office should investigate Reed's case. He advised the woman he spoke with that the matter was beyond Governor Johnson's control at this time because of the mandatory duty to issue the Governor's Warrant if the documents were in order; that the New Mexico Supreme Court had found the documents to be in order; and that there was no question but that Reed was a fugitive from justice because he was not in Ohio in accordance with the terms of his parole. Therefore, the governor would not really undo anything that had occurred as of the time of this conversation. (Dep. Tupler at p. 196, lines 24-25).

84. Reed claims he was entitled to an arraignment and to a probable cause hearing. (Dep. Reed at p. 78, lines 7-9).

85. Reed's complaints against AAG Tupler are that Tupler communicated with Ohio officials whom Tupler knew submitted false statements to the New Mexico District Attorney's office in Taos

regarding Reed, that he misrepresented the law to the court and others, that he withheld information from Governor King, that he had a conflict of interest, and that he had an evil motive. (Dep. Reed at p. 50, lines 25; p. 51, lines 1-2; p. 76, lines 3-25; p. 77, line 5; p. 78, lines 6-7; p. 79, lines 1-2; p. 134, lines 24-25; p. 146, lines 3).

86. Reed is withdrawing his claim in ¶ 62 of his Complaint as to all Defendants that "Defendants acted or failed to act based upon an invidious, class-based animus toward [Reed] due to his status as a Native American." (Dep. Reed at p. 84, lines 14-22).

87. Reed is not an enrolled member of a tribe. (Dep. Reed at p. 57, lines 14-15).

### Analysis of Tupler's Motion

Tupler argues that summary judgment should be entered in his favor because he is immune from suit under the doctrines of absolute immunity and qualified immunity. Tupler submits that all the actions he took during the extradition process were intimately associated with the judicial process. Tupler argues that Reed received all process to which he was entitled under federal or state law. Finally, with respect to Reed's state tort claims, he contends that there has been no waiver of immunity for government attorneys for the torts of intentional tort, negligence/*res ipsa*, and intentional or negligent emotional distress.

Tupler argues that he is immune from suit because all of the actions Reed alleges him to have taken, even if true, are not actionable under law, to wit: (1) communicating with Ohio officials whom he knew submitted false statements to the New Mexico attorney's office in Taos regarding Reed; (2) misrepresenting the law to the court and others; (3) withholding information from Governor King; (4) having a conflict of interest; and, (5) having an evil motive towards Reed, were done in his capacity as a prosecutor and were intimately associated with the judicial process. Reed counters that

Tupler was acting in an investigatory manner and therefore is not entitled to the protections provided by the doctrine of absolute prosecutorial immunity.

It is undisputed that Tupler is employed as an Assistant Attorney General assigned to the Criminal Appeals division. It is further undisputed that the Criminal Appeals Division handles extraditions for the State of New Mexico.[2] Similarly, it is undisputed that Defendants Marquez, Silva, Cheves and Rackstraw are employed by the District Attorneys office for Bernalillo County and that their job duties included extradition requests made by a demanding state. All were involved in Reed's extradition. The Tenth Circuit in *Roberts v. Kling*, 104 F.3d 316 (10th Cir. 1997), described the doctrine of absolute prosecutorial immunity:

> Absolute immunity "defeats a suit at the outset so long as the official's actions were within the scope of the immunity." Under the "functional approach" adopted by the Supreme Court, "`we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. In other words, absolute immunity "is justified and defined by the functions it protects and serves, not by the person to whom it attaches."

The Supreme Court provided guidance on the applicability of the doctrine of absolute prosecutorial immunity in *Imbler v. Pachtman*, 424 U.S. 409, 96 S. Ct. 984 (1976); in *Burns v. Reed*, 500 U.S. 478, 111 S. Ct. 1934, 1944 (1991); and *Buckley v. Fitzsimmons*, 509 U.S. 259, 272, 113 S. Ct. 2606, 2615 (1993). These troika of cases affirm the principle that:

> Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial and which occur in the course of his role as an advocate for the state, are entitled to the protections of

---

[2]By prior order, the Court granted Reed's motion to amend his complaint to add new defendants [Doc. 93]. The Court construes Tupler's motion for summary judgment as filed by all prosecutor Defendants, including those in the district attorney's office.

absolute immunity.

*Id.*, 509 U.S. at 272, 113 S. Ct. at 2615. Whereas, "when [a] prosecutor acts in an administrative or investigative capacity, those activities are entitle to qualified immunity only. *See England v. Hendricks*, 880 F.2d 281, 285 (10th Cir. 1989)(citing *Meade v. Grubbs*, 841 F.2d 1512, 1532 (10th Cir. 1988)).

The record reveals that all of the actions taken by the prosecutors or their staff were taken after the Ohio Adult Board of Parole issued a warrant for Reed's arrest for a parole violation, and Reed was arrested in New Mexico and steps initiated for his return to Ohio. This is the equivalent of a probable cause determination made by the demanding state and is not subject to plenary review by the asylum state, in this case, New Mexico. Indeed, the law is clear that prosecutorial actions taken following a probable cause determination "are more closely associated with the judicial process and the prosecutorial function of an advocate of the state." *Roberts, 104 F.3d at 319. See also: Cote v. Kontos*, No. 88 C 4751, 1989 WL 10854 (N.D. Ill. Feb. 8, 1989)(state and county prosecutors involved in extradition entitled to absolute prosecutorial immunity); *Larsen v. Early,* 842 F. Supp. 1310, 1313 (D.Colo. 1994)(prosecutors involved in extradition process are entitled to absolute prosecutorial immunity because litigation associated duty); *Wesley v. Kansas*, No. 92-1099, 1992 WL 208205 (10th Cir. Aug. 19, 1992)(Denver District Attorney involved in extradition absolutely immune from suit).

Reed offers no evidentiary support for his argument that the district attorney and staff and AAG Tupler were acting in an investigatory manner. Quite the contrary, none of the Defendants took the position that an investigation was warranted in an extradition situation. Indeed, they argued before Judge Nelson and the New Mexico Supreme Court that it was improper for them and for the

16

court, to investigate the facts and circumstances underlying Ohio's request. No undisputed fact supports Reed's claim that Tupler and other defendants were acting only as administrators or investigators, as opposed to participants in the judicial prosecutorial process.

There is no evidentiary support for Reed's claim that the prosecutors and staff were influenced by evil thoughts or motives towards him. Even if this were so, all actions taken were prosecutorial in nature and closely associated with the judicial process. In sum, the Court finds that Defendants Tupler, Marquez, Silva, Cheves, and Rackstraw are entitled to the absolute prosecutorial immunity from Reed's claims for violation of federal civil rights.

Assuming arguendo, that absolute immunity did not dispose of Reed's claims against the prosecutors and staff, "[t]he doctrine of qualified immunity shields individual government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Butler v. City of Prairie Village, Kansas*, 1999 WL 19116*6, No. 97-3291, (10th Cir. April 6, 1999)(quoting *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998)). Accordingly, the first step in the court's inquiry is to determine "whether the plaintiff has sufficiently alleged that the defendant violated a statutory or constitutional right." *Id.*, 159 F.3d at 516. If the plaintiff has asserted such a deprivation, only then does the court inquire "whether the right was clearly established such that a reasonable person in the defendant's position would have known that this or her conduct violated that right." "`Clearly established' for purposes of qualified immunity means that `[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is

to say that in the light of pre-existing law the unlawfulness must be apparent.'" Wilson v. Layne, ___

S. Ct. ___, 1999 WL 320817*8 (May 24, 1999)(quoting Anderson v. Creighton, 483 U.S. 635, 640

(1987)). To show that the law is clearly established, generally, "there must be a Supreme Court or

Tenth Circuit decision on point, or the clearly established weight of authority from other courts may

have found the law to be as the plaintiff maintains." *Id.*

Defendants contend that Reed failed to show that he was denied a clearly established federal

constitutional or statutory right. Defendants submit that Reed had no right to a due-process hearing

within forty-eight hours of his incarceration; and that, between the proceedings in Taos, and his

having signed a presigned waiver of extradition, he received the process to which he was entitled.

Reed takes the position that within forty-eight hours of his subsequent arrest in Albuquerque,

Defendants were required by their own policies, procedures and clearly established law to file a

fugitive complaint against Reed, which would, in turn, trigger his arraignment before a state district

judge and thereby result in his being afforded such due-process protections as the right to counsel and

the right to seek his release.

Alternatively, Reed posits that Defendants were negligent by failing and refusing to file a

fugitive complaint to have him arraigned promptly and by detaining him for thirty days. Reed

maintains that the controlling law was Judge Peggy Nelson's January 20, 1995 decision and release

order and the findings and conclusions contained therein. Reed claims that Defendants were bound

by Judge Nelson's conclusion that he was not a fugitive and therefore not subject to extradition.

Reed misapprehends the precedential value of Judge Nelson's order. Reed argues that the

order granted him his liberty and that it is effective not only in New Mexico, but throughout the

United States. He contends Judge Nelson's order quashed the outstanding arrest warrant. Reed's contention is not well-taken.

First, Judge Nelson's order of release was not as broad as Reed argues. Reed was granted his liberty from the Taos County Detention Center. The order mandated the named respondent, the director of the Taos County Detention Center, to take specific action. Thus, the order did not and could not apply to entities not named as parties. Hence, it did not supersede an outstanding arrest warrant posted on the NCIC computer base or supersede a demanding state's ability to seek extradition. Here, Reed attempts to bind Ohio to a ruling where it was not a party.

Secondly, Judge Nelson's order is not the same as "clearly established" law. Reed mistakenly argues that the controlling law is this case is Judge Nelson's opinion. The controlling law in this area is that issued by the United States Supreme Court or the Tenth Circuit or decisions by other circuit's which have advanced Reed's position. *Butler v. City of Prairie Village, Kansas*, 172 F.3d 736 (10th Cir. 1999). The opinion relied upon by Reed was contrary to clearly established Supreme Court precedent, *Michigan v. Doran,* and was reversed by the United States Supreme Court. The record shows that Defendants were aware of the applicable law and all actions taken in their prosecutorial capacities were in accord with the law. Indeed, Judge Nelson's decision disclosed that the State argued that her review was governed by the law of extradition, and, in particular, the decision by the Supreme Court in *Michigan v. Doran.*

The clearly established law applicable here is that contained in the seminal decision of *Michigan v. Doran*, 439 U.S. 282, 99 S. Ct. 530 (1988), which describes extradition and the four available grounds for an asylum state's refusal to extradite: "(a) the extradition documents facially are not in order; (b) the person has not been charged with a crime in the requesting state; (c) the

person is not the person named in the extradition documents; and, (d) the person is not a fugitive." *Id.* at 1208.

Reed does not satisfy the above criteria. For example, the United States Supreme Court held that the extradition documents were in order, that Reed had been charged with a crime in Ohio. Reed's identity was proven and he was a fugitive. Under clear Supreme Court precedent, Reed was to be arrested and returned to Ohio. There has been no violation of clearly established law.

Defendants argue that Reed fails to offer any clearly established federal law entitling him to any type of hearing prior to his rendition to Ohio, and that, in any event, any hearing could not go beyond that prescribed by the Supreme Court in *Michigan v. Doran.*

The extradition Clause of the United States Constitution provides in pertinent part:

> A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime.

Art. IV, Clause 2.

In *Michigan v. Doran*, the Supreme Court described not only the purpose of the Act, but also outlined the type of review that may be made by an asylum state once the demanding state seeks return of the fugitive. The language of the Court is instructive:

> The Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed. The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus "balkanize" the administration of criminal justice among the several states. It articulated, in mandatory language, the concepts of comity and full faith and credit found in the immediately proceeding clause of Article IV. The Extradition Clause like the commerce clause served important national objectives of a

newly developing country striving to foster national unity. In the administrative of justice, no less than in trade and commerce, national unity was thought to be served by de-emphasizing state lines for certain purposes, without impinging on essential state autonomy.

439 U.S. at 286-287; 99 S. Ct. at 534-535.

The Court delineated the inquiry to be made by the asylum state:

Once the Governor has granted extradition, a Court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and, (d) whether the petitioner is a fugitive. These are historic facts readily verifiable.

Simply put:

When a neutral judicial officer of the demanding state has determined that probable cause exists, the courts of the asylum state are without power to review the determination . . . . To allow plenary review in the asylum state of issues that can be fully litigated in the charging state would defeat the plain purposes by the summary and mandatory procedures authorized by the Act. IV., 2."

*Id.* at 536, at 290.

Nowhere in the Extradition Clause or Supreme Court case law interpreting the same is there a requirement for a hearing to be held within the time frame urged by Reed. Indeed there is no mention of the need for an immediate hearing. Reed appears to confuse the panoply of rights of an initial arrestee with those for one arrested on a parole violation where interstate extradition is being sought. The Supreme Court suggested in *Doran*, "The Clause never contemplated that the asylum state was to conduct the kind of preliminary inquiry traditionally intervening between the initial arrest and trial." This is particularly true because the asylum state is bound by the demanding state's determination of probable cause. *Doran*, 439 U.S. at 290, 99 S. Ct. At 536.

In a subsequent decision, *Cuyler v. Adams*, 449 U.S. 433, 449 n.15, 101 S. Ct. 703, 712 (1981), the Court observed that the "reasonable time" a judge fixes for a prisoner to file a writ of habeas corpus under the Extradition Act might also be computed in recognition of the 30-day period established by the Detainer Act. This suggests the lack of urgency and immediacy in bringing the matter to a court's attention. This recognizes that it takes time to coordinate the exchange of information between sovereigns since the material necessary to complete a fugitive complaint comes from the demanding state.

Notwithstanding Reed's arguments to the contrary, there was nothing ordinary and routine about his case. This was not a routine or run-of-the-mill extradition. Reed complains that he was not afforded a hearing in Albuquerque within a reasonable time. Reed is correct that once a fugitive complaint is filed, he is entitled to a hearing. Reed received this hearing. This happened in Taos. There, he was arrested on October 27, 1994, and a fugitive complaint filed the following day. Reed was brought to court on October 31, 1994, where he was told about the warrant and advised of available rights, such as challenging extradition by filing a habeas action. Reed informed the court he would challenge the constitutionality of the arrest. Although he never filed a habeas petition, a three-day evidentiary hearing was held. Reed was represented by counsel and was able to present his case. Because the State of Ohio was not a party, his claims and contentions were unrebutted. Therefore, when he was arrested again, confusion arose over the appropriate judicial forum to consider the matter--as a habeas petition before the Second Judicial District, or as part of the appeal already pending before the New Mexico Supreme Court. The decision was made at the behest of Reed's own attorney to proceed with an immediate hearing before the Supreme Court and to forego the filing of a fugitive complaint in Albuquerque.

What Reed fails to recognize is that his attorney, acting as an agent, made clear that Reed was not to be returned to Ohio and that the issue of his release would be considered by the New Mexico Supreme Court. Reed's appellate attorney, Hermann, wrote letters to BCDC and Marquez and spoke with Tupler on several occasions. Indeed, in Hermann's letter of November 22, 1996, addressed to authorities at the Bernalillo County Detention Center, she writes:

> A new petition for writ of habeas corpus was filed in the New Mexico Supreme Court on Wednesday, Nov. 20, 1996. The Court has set a hearing for Dec. 4, 1996. Assistant Attorney General Anthony Tupler, who is in charge of this case, has agreed with me that no proceedings will be initiated to return Mr. Reed to Ohio pending resolution of the current petition before the Supreme Court.

*See* Defendant's Motion for Summary Judgment, filed February 10, 1999, Ext. E. The Court can take judicial notice of adjudicative facts. *See* Fed. R. Evid. 201.

Thus, per agreement between counsel, the matter was argued before the Supreme Court via a motion for stay and a fugitive complaint was not filed. It is disingenuous for Reed to argue that he was deprived of a hearing when he, through his attorney, made a tactical decision to proceed in this manner. This was not a situation where Reed was uneducated in the law. Indeed, he acknowledged expertise in the area of extradition. Moreover, Reed asserts that the district attorney's office and Attorney General's had policy manuals directing that a hearing be held within three days of arrest. Defendants, through affidavit, have averred there are no such policies. Reed has not proffered any evidentiary support for his assertion and argument of counsel is not sufficient to defeat summary judgment.

Finally, to the extent that Reed claims Section 1983 violations based on negligence, the law is clear that negligence is not a constitutional tort cognizable under Section 1983. <u>Sampley v.</u>

Ruettgers, 704 F.2d 491 (10th Cir. 1983).

## Reed's Waiver of Extradition

Reed executed a pre-signed waiver of extradition as a condition of his parole. "Courts have routinely held that such a waiver of extradition `waives[s] any constitutional rights implicated by a return for parole violation without formal extradition proceedings.'" *Hinton v. Moritz*, 11 F.Supp2d 272, 275 (W.D.N.Y. 1998)(quoting *Wrenn v. California State Parole*, 1992 WL 112276 (D. Kan 1992)); *See also*: *Pierson v. Grant*, 527 F.2d 161 (8th Cir. 1975); *Wysinger v. White*, 1997 Wl 92461*3 (D. Kan. 1997); *Bradley v. Extradition Corporation of America*, 758 F. Supp. 1153, 1157 (W.D. La 1991); *Siegel v. Edwards*, 566 F.2d 958, 960 (5th Cir. 1978). Thus, Reed waived any rights to a hearing before extradition.

Reed's attempts to challenge the authenticity of his signature and the voluntariness of his signature are of no consequence. The signed document was part of his Ohio parole paperwork. Reed was certainly aware of the consequences of altering parole documents, since doing so in the past resulted in a revocation of his parole. The second time he qualified for parole, he signed the requisite documents, which included an extradition waiver. Indeed, Reed admits that the signature on his parole waiver may be his valid signature. (Dep. Reed at p. 18, lines 11-13). Reed argues Tupler did not argue the existence of the waiver at oral argument before the Supreme Court, and, therefore, should be precluded from arguing waiver here. The record reflects that the district attorney office in Taos was unaware of the waiver, as it was not attached to the papers before the court and was not part of the appellate record. The "waiver" argument was not waived by Tupler. Reed cannot establish the existence of a clearly established right.

## Section 1985 and 1986 Claims

Reed also alleged violations under Sections 1985 and 1986. The Defendants submit that Reed is not a member of a protected class and cannot meet the elements of proof for this claim. Reed did not respond to the arguments, and, in his deposition, stated that he would withdraw class based animus claims. (Dep. Reed p. 84, lines 101-22). Failure to respond to an argument constitutes consent. D.N.M.LR-Civ. 7.5(b). Accordingly, summary judgment will be entered in favor of the Defendants on Reed's claims brought pursuant to 42 U.S.C. § 1985 and § 1986.

## State Tort Claims

Finally, Reed brings several state tort claims. He alleges a claim for intentional tort, negligence/*res ipsa loquitur*, *prima facie* tort and intentional or negligent emotional distress. Defendants move for summary judgment on these claims because there has been no waiver of immunity under the New Mexico Tort Claims Act. Reed states that his claims are brought properly under the waiver for law enforcement officers. Tupler counters that in his capacity as a prosecutor, he does not meet the definition of a law enforcement officer.

Common law sovereign immunity for tort actions was abolished by the New Mexico Supreme Court in *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975). In response, the New Mexico Legislature passed the Tort Claims Act. The Act reinstated governmental immunity except in eight classes of activities which were specifically set out as exemptions within the Act. *Fireman's Fund Insurance Co. v. Tucker*, 95 N.M. 56, 618 P.2d 894 (Ct. App. 1980). Section 41-4-2 of the Act provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act." Further, Section 41-4-4 declares that governmental entities and public employees, while acting within the

scope of their duties, shall be immune from liability for any tort as waived by the Act. *Tompkins v. Carlsbad Irr. Dist.*, 96 N.M. 368, 630 P.2d 767 (Ct. App. 1980).

Here, Reed relies on the law enforcement officer exception. The statute defines a law enforcement officer as follows.

> Any full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes or members of the national guard when called to duty by the governor.

41-4-3(D).

Reed contends that a prosecutor functions in the same manner as a law enforcement officer since the duties of a prosecutor include keeping those alleged of crimes in custody. Reed asserts that this results in a loss of liberty for those accused of a criminal offense. Reed's argument amounts to an overly broad reading of the statute. New Mexico's intermediate appellate court considered and rejected a similar argument in *Coyazo v. State*, 120 N.M. 47, 897 P. 2d 234 (Ct. App. 1995). There, the court found that the law enforcement exception did not apply to the district attorney's office when it acts in its prosecutorial capacity. Therefore, Defendants Marquez, Silva, Cheves and Rackstraw are clearly covered by the court's holding. Likewise, this Court finds that the exception does not apply to an assistant attorney general conducting his normal prosecutorial activities in handling an extradition.

Reed's argument would make those involved in any aspect of a criminal prosecution a law enforcement officer and thus exempt and amenable to suit under the Tort Claims Act. This was not the intent of the legislature which envisioned a more traditional definition of a law enforcement officer. The court held:

> District attorneys and their lawyer assistants are primarily involved in lawyerly activities concerning the prosecution of criminal offenses being brought and argued in the judicial forum. The inquiry then becomes whether or not the judicial and prosecutorial activities of district attorneys and their staffs can be considered traditional duties of law enforcement officers.
>
> We think no.

*Coyazo*, 120 NM at 50, 897 P.2d at 237.

The Court finds that Reed's claims against Defendants Tupler, Marquez, Silva, Cheves, and Rackstraw under the Tort Claims Act must fail because there has been no waiver of immunity. Moreover, even assuming that the Defendants were amenable to suit, neither *prima facie* tort nor intentional infliction of emotional distress are included in the list of torts for which immunity has been waived. Consequently, immunity has not been waived for these torts. See *Romero v. Otero*, 678 F.Supp. 1535 (D.N.M. 1987).

Finally, negligence/*res ipsa loquitur* is not a tort. "*Res Ipsa Loquitur*," a Latin phrase, meaning "the thing speaks for itself," is simply a method of proving negligence by inference. It provides for an inference of culpability under certain circumstances and allows a plaintiff to make a *prima facie* showing with regard to specific acts of negligence. *Romero v. Truchas Mut. Domestic Water Consumer & Mut. Sewage Works Ass'n*, 121 N.M. 71, 908 P.2d 764, *cert. denied,* 120 N.M. 828, 907 P.2d 1009 (1995); *overruled on other grounds*, *Spectron Development Laboratory, a Div. Of Titan Corp. v. American Hollow Boring*, 123 N.M. 170, 936 P.2d 852 (N.M. App. 1997). Negligence is an aspect of duty and relates either to an act or failure to act. U.J.I. 13-1601; Restatement of Torts, § 284; *Cotter v. Novak*, 57 N.M. 639, 261 P.2d 827 (1953). While claims can be brought against governmental entities and public employees who negligently perform their

responsibilities, those claims can only be brought in accord with the requirements of New Mexico's Tort Claims Act. Here, Reed seeks to bring a separate common law "tort of negligence." There is no cause of action for this claim under the Tort Claims Act.

In conclusion, the Court finds that Defendant Tupler's motion for summary judgment is well-taken and should be granted. Judgment should be entered in his favor on all of Reed's claims. Similarly, the Court finds that judgment should also be entered in favor Defendants Marquez, Silva, Cheves and Rackstraw.

_____
Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEY FOR PLAINTIFF:
Stevan D. Looney, Esq.

ATTORNEYS FOR DEFENDANTS:
Joan M. Waters, Esq.
Jeffrey L. Baker, Esq.